[Civ. No. 18289. Second Dist., Div. Three. Sept. 26, 1951.]

AMERICAN AUTOMOBILE INSURANCE COMPANY (a Corporation), Respondent, v. AMERICAN FIDELITY AND CASUALTY COMPANY OF RICHMOND, VIRGINIA (a Corporation), Appellant.

McBain & Morgan and Angus C. McBain for Appellant.

Parker, Stanbury & Reese and J. H. Peckham for Respondent.

VALLÉE, J.—Appeal by defendant American Fidelity and Casualty Company from a judgment in a declaratory relief action decreeing that under a motor vehicle liability policy it was liable for damages caused by its assured, arising out of the use of a motor vehicle.

Exeter Oil Company, Ltd., a corporation, and two of its affiliated enterprises (all referred to as Exeter), operated an oil terminal in the Los Angeles Harbor area. Plaintiff's policy insured Exeter against liability imposed upon it by law for damages arising out of the ownership, maintenance

and use of its property, both real and personal, at its marine terminal, but specifically excluded any loss or damage arising out of the operation, maintenance or use of its motor vehicles. (It is conceded that in excluding loss or damage arising out of the operation, maintenance or use of motor vehicles, plaintiff was excluding loss or damage arising out of the loading or unloading of motor vehicles.) Defendant-appellant's policy insured Exeter against liability imposed upon it by law for damages arising out of the ownership, maintenance and use of its motor vehicles. It contained the following provision: "The purposes for which the automobile is to be used are Commercial . . . (b) The term 'commercial' is defined as use principally in the business occupation of the named insured . . . (c) Use of the automobile for the purposes stated includes the loading and unloading thereof." The occupation of insured was listed as "Commercial Truckmen."

On June 15, 1947, and while both policies were in force, a quantity of Diesel oil escaped from a partially open valve on the unloading rack of Exeter's marine terminal, spilled into the waters of the harbor, and caused damages for which claims have been presented to Exeter. Exeter has requested that plaintiff and defendant pay these claims.

The circumstances surrounding the escape of the Diesel oil were established at the trial by the following stipulated facts: The unloading rack was a stationary part of the terminal, with a pair of intake risers, A-1 and B-2, for unloading Diesel oil. The risers, with intake valves, were joined to an underground pipe which conducted oil entering the risers to storage tanks. A hose was attached to each intake riser, and in unloading a truck or trailer was attached to an outlet on the truck or trailer. A pump on the loading rack, operated by an employee of Exeter known as a pumper, was used to pump oil from trucks and trailers to the storage tanks. When the intake riser hose was connected to a truck or trailer, it was the practice of the driver thereof to open the valve on the truck or trailer when told to do so by the pumper. At the same time the pumper opened the valves on the intake risers and put the pump in operation. As unloading neared completion it was the practice of the driver to assume a position on top of the truck or trailer where he could look through the open dome and, as the truck or trailer emptied or sucked air, turn off the valve, whereupon the pumper would turn off the valve on the intake riser and stop the pump.

Approximately one half to one hour before the accident, a tank truck and trailer, owned by Exeter and carrying Diesel oil, was unloaded as was the practice through intake risers A-1 and B-2. After unloading, the truck and trailer drove away. A half hour later a tractor and semitrailer, owned by Exeter, driven by its employee, and covered by defendant's policy, arrived with a load of Diesel oil. The semitrailer only was to be unloaded. The driver connected the hose from intake riser A-1 with the metal outlet on the semitrailer and, when told to do so by the pumper, opened the valve on the trailer. At the same time, the pumper opened the valve on intake A-1 and put the pump in operation. The two men then went to a shack some 20 feet away and some minutes later, while the unloading was proceeding, noticed Diesel oil running from the hose on intake riser B-2. It was this oil which drained into the harbor and caused the damages for which claims have been filed. The pumper had, apparently, failed to entirely close the valve on intake riser B-2 after the unloading of the truck and trailer which preceded the semitrailer, and the oil which was pumped from the semitrailer through intake riser A-1 entered the pipe joining intake risers A-1 and B-2 and was forced through the B-2 open valve.

The superintendent of the terminal testified that it was not possible for oil to run out of the storage tanks because of a check valve in the line, and that if any oil spill occurred during an unloading operation the oil could come only from the unloading of the truck. There was testimony that the oil which leaked "spilled during the process of the unloading" of the semitrailer.

Plaintiff filed the present action for declaratory relief, seeking to have determined whether both of the insurance policies, or only one of them, covered the claims for damages. The court found that any loss arising as a result of the accident, occurred during the unloading of the oil from Exeter's semitrailer, and concluded that its liability for the damages caused by the overflow was covered by defendant's, and not by plaintiff's, policy.

Defendant contends the evidence does not support the finding that the damages were caused during the unloading of the semitrailer, arguing that the oil had been delivered to the marine terminal when it entered the intake valve provided to receive the oil for the pipe line; that it was the use and maintenance of the terminal's properties while transporting

oil from the unloading rack to the storage tanks, which caused the escape of the oil and, therefore, any damages caused thereby were not covered by its policy but were covered by plaintiff's policy.

Counsel have cited no case in which the scope of a "loading and unloading" provision in an insurance contract, similar to the one involved here, has been considered by the California courts, and so far as we have been able to ascertain the case is one of first impression in this state. The provision has, however, been considered by courts in other jurisdictions, with the result that there is a decided conflict with respect to the construction to be given the "loading and unloading" provision. Generally speaking, in determining whether the accident occurred during the unloading of a motor vehicle within the meaning of a "loading or unloading" provision in a liability policy, the courts have adopted one of two theories, the "coming to rest" or the "complete operation" doctrine.

Of the two, the "coming to rest" doctrine gives the more limited construction to the "loading and unloading" provision. Under this doctrine, "unloading" includes only the actual removing or lifting of the article from the motor vehicle up to the moment when it has actually come to rest and has started on its course to be delivered by other powers and forces independent of the motor vehicle, and the motor vehicle itself is no longer connected with the process of unloading. The motor vehicle is then said to be no longer in use.[1]

Under the "complete operation" doctrine, which is the broader of the two, "unloading" is regarded as embracing all the operations which are required in any specific situation to effect a completed delivery of the article. For practical purposes, this doctrine makes no distinction between "unloading" and "delivery."[2]

[1]*Stammer* v. *Kitzmiller*, 226 Wis. 348 [276 N.W. 629, 631]; *American Casualty Co.* v. *Fisher*, 195 Ga. 136 [23 S.E.2d 395, 144 A.L.R. 533] (followed in *Fisher* v. *American Casualty Co.*, 68 Ga.App. 806 [24 S.E.2d 229]); *St. Paul Mercury Indemnity Co.* v. *Standard Acc. Ins. Co.*, 216 Minn. 103 [11 N.W.2d 794]; *Ferry* v. *Protective Indemnity Co.*, 155 Pa.Super. 266 [38 A.2d 493]; *Handley* v *Oakley*, 10 Wn.2d 396 [116 P.2d 833]; *Maryland Casualty Co.* v. *United Corporation* (1940 D.C.), 35 F.Supp. 570, 572; *Zurich General Acc. etc. Co.* v. *American Mut. L. Ins. Co.*, 118 N.J.L. 317 [192 A. 387, 388]; Anno: 160 A.L.R. 1259, 1264; see, also, The Lawyer and Law Notes, Spring Issue, 1948, p. 21.

[2]State [*ex rel. Butte Brewing Co.*] v. *District Court*, 110 Mont. 250 [100 P.2d 932, 934]; *Pacific Automobile Ins. Co.* v. *Commercial Cas. Ins. Co.*, 108 Utah 500 [161 P.2d 423, 428, 160 A.L.R. 1251]; *Turtletaub* v. *Hardware Mut. Casualty Co.* (N. J. Dist. Ct.), 62 A.2d 830, 834; *Wheeler* v. *London Guarantee & Accident Co.*, 292 Pa. 156 [140

■ It has uniformly been held that the "loading and unloading" provision in insurance contracts, such as involved here, is one of extension. It expands, rather than limits, the term "the use of" the motor vehicle somewhat beyond its usual connotation so as to bring within the policy some acts in which the motor vehicle itself does not play any part.[3]

In *Pacific Automobile Ins. Co.* v. *Commercial Cas. Ins. Co.*, 108 Utah 500 [161 P.2d 423, 160 A.L.R. 1251], the court adopted the "complete operations" doctrine, and reviewed at great length many of the cases cited here, and others, and from them formulated the following rules, page 427 (161 P.2d):

"1. The intention of the parties to the insurance contract should be kept constantly in mind by the court in determining the scope of coverage brought within 'loading and unloading' clauses or 'ownership, maintenance and operation' clauses.

"2. Loading and unloading include more than mere placing the goods on the truck or removal of the goods from the truck, so that when they are taken directly from the truck, and in one continuous operation carried into the customer's place of business, they are still in the process of being unloaded when set down therein.

"3. There must be some causal relationship between the use of the insured vehicle as a vehicle and the accident for which recovery is sought."

The court concluded, page 428: "that the proper rule of construction of policies such as here involved is that the

A. 855]; *Washington Assur. Corp.* v. *Maher* (Pa.), 31 Del.Co.Rep. 575; *B. & D. Motor Lines* v. *Citizens Casualty Co.*, 181 Misc. 985 [43 N.Y.S. 2d 486, 487-8], affirmed 267 App.Div. 955 [48 N.Y.S.2d 472], leave to appeal denied, 268 App.Div. 755 [49 N.Y.S.2d 274]; *Krasilovsky Bros. Truck. Corp.* v. *Maryland Cas. Co.*, 54 N.Y.S.2d 60; *Schmidt* v. *Utilities Ins. Co.*, 353 Mo. 213 [182 S.W.2d 181, 154 A.L.R. 1088]; *Maryland Casualty Co.* v. *Cassetty*, 6 Cir., 119 F.2d 602, 604; *St. Paul Mercury Indemnity Co.* v. *Crow*, 5 Cir., 164 F.2d 270; *Maryland Casualty Co.* v. *Tighe*, 29 F.Supp. 69, 70-71, affirmed 115 F.2d 297; *Connecticut Indemnity Co.* v. *Lee*, 1 Cir., 168 F.2d 420, 425 [*Connecticut Indemnity Co.* v. *Lee*, 74 F.Supp. 353]; *Maryland Casualty Co.* v. *Dalton Coal & Material Co.*, 8 Cir., (Mo.) 184 F.2d 181, 182; *Coulter* v. *American Employers' Ins. Co.*, 333 Ill.App. 631 [78 N.E.2d 131, 135-136]; *London Guarantee & Accident Co.* v. *C. B. White & Bros.*, 188 Va. 195 [49 S.E.2d 254, 258-259]; Anno: 160 A.L.R. 1259, 1267; see, also, The Lawyer and Law Notes, Spring Issue, 1948, p. 21.

[3]*Pacific Automobile Ins. Co.* v. *Commercial Cas. Ins. Co.*, 108 Utah 500 [161 P.2d 423, 424, 160 A.L.R. 1251]; *Washington Assur. Corp.* v. *Maher* (Pa.), 31 Del.Co.Rep. 575; *Ferry* v. *Protective Indemnity Co.*, 155 Pa.Super. 266 [38 A.2d 493, 494]; *Connecticut Indemnity Co.* v. *Lee*, 1 Cir., 168 F.2d 420, 425; 7 Appleman Insurance, § 4322, p. 92; Anno: 160 A.L.R. 1259, 1263.

mission, or transaction, or function being performed by the insured's employees at the time of the accident is the controlling element in determining whether the situation from which the accident occurred is included in loading and unloading. The job being performed here, that part of the insured's business functioning at the time of the accident was that of making a proper commercial delivery. The policy of plaintiff included and the policy of defendant excluded the business of making commercial deliveries. Both policies treat the 'use of the truck' as expanded to cover all activities involved not only in transporting and hauling, but in doing all things in getting the articles onto the truck and off the truck, which were necessary and proper in making and completing the commercial delivery of the goods—all things which insured's employees were required to do in making delivery of the beer, and in which the truck was involved as one of the media of transport.''

■ Since plaintiff's policy expressly excluded from its coverage losses arising out of the use of motor vehicles (in so doing it excluded any loss or damage arising out of the loading or unloading thereof), and since defendant's policy expressly included in its coverage all losses arising out of the use of motor vehicles, including the ''loading and unloading'' thereof, the conclusion is inescapable that the provision ''loading and unloading'' was intended to expand the meaning of the term ''use'' of the motor vehicles in defendant's policy to cover all activities of Exeter while acting as ''Commercial Truckmen'' and in the making of deliveries as such. ■ As a matter of common knowledge, ''commercial delivery'' includes ''taking the articles from their usual place of storage or assembly to the place of destination and turning them over to the control or possession of the purchaser or receiver. Sometimes delivery may be made by depositing things on the sidewalk or on a platform or other convenient place. That, however, is usually indicated by the custom of the business or agreement of the parties. Normally a delivery is not completed until the deliveror has finished his handling of the article, has completed his assignment or task of putting the articles into the possession of the receiving party.'' (*Pacific Automobile Ins. Co.* v. *Commercial Cas. Ins. Co., supra,* 108 Utah 500 [161 P.2d 423, 428, 160 A.L.R. 1251].)

■ Necessarily, no general rule can be laid down as to when an accident arises out of the ''unloading'' of a vehicle,

but each case must be separately considered according to the particular facts involved.[4]

. In *St. Paul Mercury Indemnity Co.* v. *Crow,* 5 Cir., 164 F.2d 270, it was held that an accident which occurred while delivering fuel oil from a truck to a storage tank by means of a 5-gallon can and funnel, which were carried on the truck as part of its equipment, arose out of the use or unloading of the truck. The tank overflowed, oil ran out, ignited, and burned a sawmill. In *General Accident etc. Corp.* v. *Hanley Oil Co.,* 321 Mass. 72 [72 N.E.2d 1, 171 A.L.R. 497], it was held that the accident occurred during the unloading of a truck by means of a hose, which was a part of the equipment of the truck and which was connected to the fill pipe of a storage tank. Oil pumped into the tank through the hose overflowed, ignited about three hours after the truck had left, and burned a house.

 Defendant makes much of the fact that the intake risers and pump were a part of the loading rack, a stationary part of the terminal, and that the accident was, as it asserts, proximately caused by the negligence of the pumper in charge thereof. Under defendant's policy it is liable for damages because of injury to property caused by accident and arising out of the *use* of the motor vehicle. Such a policy does not require that the injury be a direct and proximate result, in any strict legal sense of that term, of the use of the motor vehicle covered by the policy. (*Schmidt* v. *Utilities Ins. Co.,* 353 Mo. 213 [182 S.W.2d 181, 183, 154 A.L.R. 1088]; *Merchants Co.* v. *Hartford Accident & Indemnity Co.,* 187 Miss. 301, 308 [188 So. 571, 192 So. 566]; *Panhandle Steel Products Co.* v. *Fidelity Union Casualty Co.,* (Tex.Civ.App.) 23 S.W.2d 799; 7 Appleman Insurance Law & Practice, § 4317.)

 The question whether the accident occurred during the unloading of the trailer is not answered by saying, as does defendant, that the driver of the truck and semitrailer was not negligent and that the pumper was negligent, and that, therefore, the leakage of oil occurred in the maintenance and use of the unloading rack, and did not occur in the unloading of the trailer. The question is whether use of the un-

---

[4] *American Oil & Supply Co.* v. *United States Casualty Co.,* 19 N.J. Misc. 7 [18 A.2d 257, 259]; *Franklin Co-op. C. Ass'n.* v. *Employers' L. Assur. Corp.,* 200 Minn. 230 [273 N.W. 809, 810]; *Turtletaub* v. *Hardware Mut. Casualty Co.,* (N.J. Dist. Ct.) 62 A.2d 830, 832; *Connecticut Indemnity Co.* v. *Lee,* 74 F.Supp. 353, 359; 7 Appleman Insurance, § 4322, p. 92.

loading rack was part of the operation of unloading the trailer. Unloading is the removing of the load or the part of load that is being unloaded from the time that operation is started until that operation is completed. Running the oil from the trailer through the intake riser into the storage tank was not an act separate from and independent of the use of the trailer, but a step attached to its use and necessary to accomplish the purpose for which the trailer was being used. The ultimate purpose was to deliver the oil into the storage tank. Only by running the oil through the intake riser could the mission of the trailer be accomplished and its use be made effective. Running the oil through the intake riser was an integral part of the unloading process and it was covered by defendant's policy.

Irrespective of whether the "complete operation" doctrine or the "coming to rest" doctrine is applied, it is clear from the foregoing that the accident falls within the coverage of the "loading and unloading" provision of defendant's policy since the accident occurred while unloading was in progress and before the oil had come to rest in the storage tank, its ultimate destination.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied October 23, 1951.