[Civ. No. 27057.    Second Dist., Div. Three.    Aug. 17, 1964.]

SAN FERNANDO VALLEY CRANE SERVICE, INC., Plaintiff and Appellant, v. THE TRAVELERS INSURANCE COMPANY et al., Defendants and Respondents.

Kinkle, Rodiger, Graf & Dewberry and David W. Graf for Plaintiff and Appellant.

Schell & Delamer, Fred B. Belanger and Austin C. Smith, Jr., for Defendants and Respondents.

FORD, J.—The plaintiff San Fernando Valley Crane Service, Inc. (hereinafter called Crane Service) has appealed from a judgment in an action for declaratory relief brought by it against The Travelers Insurance Company (hereinafter called Travelers), Consolidated Rock Products Company (hereinafter called Consolidated), and Harold Bartholomew. The judgment declared that Travelers was under no duty to defend or indemnify Crane Service or its employee, Bartholomew, with respect to a cause of action of LeRoy Gibson for damages for personal injuries arising out of an accident which occurred when concrete was being removed by means of Crane Service's crane from a truck of Consolidated into position on a building under construction.

Part of the findings of fact of the trial court were as follows: 1. On January 16, 1958, Mayfair Construction Company (hereinafter called Mayfair) was, as the general contractor,

engaged in "certain construction." 2. Mayfair had entered into a written contract with Consolidated for the purchase of ready-mixed concrete. Delivery was to be made by truck at the curb except that, if ordered by Mayfair, delivery would be made at another point which was accessible to Consolidated's truck. 3. On January 16, 1958, Consolidated brought cement to the job site in a "mixer-truck." Mounted on the truck bed behind the cab was a large revolving drum containing the cement aggregate which was mixed in transit. The drum had a circular opening at the rear of the truck. Unloading of the cement was mechanically done by causing the drum to tilt and thus spill the cement into a chute which was a part of the vehicle. 4. Under an agreement with Mayfair, Crane Service undertook to furnish to Mayfair a truck-crane, together with an operator, "for the purpose of transporting said cement in the receptacle into which it had been delivered into certain forms on the job site into which it was impossible for Consolidated to pour its cement so purchased because of the height of such forms." The truck-crane furnished was one which Crane Service had leased from its owner. The receptacle was a bucket owned by Crane Service and "used in conjunction with the use of said truck-crane." 5. "The truck crane . . . was a motor vehicle registered in and bearing a California automobile license plate and was capable of being driven and was driven on highways . . . . Mounted on a platform to the rear of the truck cab was a crane which pivoted on a table to which the boom of the crane was pivotally mounted so as to permit the operator of the truck crane to transport receptacles or other items attached to the boom hooks upon the highway or otherwise. The truck crane was . . . a single unit and the crane could not have been operated without the connection with and the power provided by the truck engine. The draw works of the crane portion of the truck was . . . operated by a master drive chain running to the truck transmission." 6. At the time of the accident to LeRoy Gibson, "Consolidated had delivered into the bucket receptacle provided by Mayfair through" Crane Service "a portion of its cement so purchased." 7. "Following said delivery of said cement into such bucket receptacle, Consolidated exercised absolutely no control over the cement, the bucket receptacle, or the truck-crane." Crane Service "exercised sole and exclusive control over said bucket receptacle and said truck-crane by and through its said employee, Bartholomew." 8. While Crane Service "was transporting said cement

in such bucket receptacle to forms prepared by Mayfair for the purpose, the boom of such truck-crane collapsed, and the tip of the boom struck LeRoy Gibson, a construction worker employed on the job site by Mayfair.'' 9. Such collapse ''occurred as a sole and proximate result of negligence on the part of Bartholomew [Crane Service's employee] in his operation, maintenance, and control of the truck-crane.'' 10. At the time of the collapse of the boom, Consolidated and its employee, Loreno, ''had completed every act, contemplated or possible, to be done by them in delivering that portion of the cement where the consignee, Mayfair, wanted it delivered.'' 11. Thereafter Gibson filed an action for damages against Crane Service, Consolidated, Bartholomew, and the concern which had leased the ''truck-crane'' to Crane Service. In his amended complaint Gibson alleged that his injury was proximately caused by the defective condition of the crane, of which condition the defendants had knowledge, and by its negligent operation and maintenance. It was not alleged in that pleading that the injury was caused by ''the use of any defendant of the Mixer Truck owned by Consolidated . . . or the use of the Mixer Truck owned by Consolidated in the unloading thereof or otherwise or at all.'' 12. When the Gibson action came on for trial, it was settled for the sum of $61,500, of which amount $40,000 was paid on behalf of Crane Service, $1,500 on behalf of Consolidated, and $20,000 on behalf of the concern from which Crane Service had leased the equipment. 13. At the time of the accident Consolidated was the named insured under a comprehensive liability policy issued by Travelers. It was therein provided that: ''Use of an automobile includes the loading and unloading thereof.'' It was further provided as follows: ''The unqualified word 'insured' includes the named insured and also includes . . . (2) under Coverages A [bodily injury liability] . . . any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, . . .'' 14. Consolidated's truck was not being used by either Crane Service or Bartholomew at the time of the accident. 15. After the happening of the accident, Crane Service and Bartholomew ''made demand and tender upon Travelers claiming in opposition to the contentions of the Travelers that the Travelers automobile policy afforded protection to them which demand and tender were declined.'' 16. At the time of the accident,

Crane Service was insured under a comprehensive liability policy issued by Aetna. That policy was in part as follows: "The unqualified word 'insured' includes the named insured and also includes . . . (2) under coverages A [bodily injury liability] and C, any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. . . ." "Automobile," within the meaning of the policy, was defined in part in the following language: "Except where stated to the contrary, the word 'automobile' means a land motor vehicle as follows: . . . (2) Hired Automobile— an automobile used under contract in behalf of, or loaned to, the named insured. . . ." With respect to the matter of other insurance, the Aetna policy provided: "If the insured has other insurance against a loss covered by this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectable insurance against such loss; provided, however, the insurance under this policy with respect to loss arising out of the maintenance or use of any hired automobile insured on a cost of hire basis or the use of any nonowned automobile shall be excess insurance over any other valid and collectable insurance." 17. "The truck-crane leased by [Crane Service] . . . was such a 'hired automobile' as defined in said Aetna Policy." Gibson's bodily injury was caused by accident and "arose out of the use of said truck-crane." 18. "The insurance under said Aetna Policy is primary insurance and no insured under such policy had or has any other insurance against the loss occasioned by the Gibson accident which was and is covered by said policy. There is and was no other valid and collectable insurance against such loss available to any such insured under such Aetna Policy."

Harold A. Bartholomew, the operator of the crane, testified that he drove the crane from Crane Service's yard to the place where it was at the time of the accident, which was approximately 15 feet "inside the sidewalk line." Consolidated's truck was backed into position directly behind the Crane Service vehicle. The two vehicles were 5 to 10 feet apart. The concrete was "delivered" by the truck driver to the bucket, which was on "the whip line" of the crane, by means of a chute which extended from the rear of the Consolidated

truck down to the bucket. A Mayfair employee placed the bucket in position at the location of Consolidated's truck. Mr. Bartholomew, as the crane operator, gave signals to the driver of the truck and the bucketman, indicating the level to which the bucket was to be filled. The bucket was then lifted by the crane operator to the position of the "wall area" where the concrete was to be used. When the accident occurred, Mr. Bartholomew had lifted a bucket of cement "to its proper height" and "was proceeding to lower the boom into position." The boom "twisted to the right and down" and the tip of the boom struck Mr. Gibson.

Jimmy Loreno, the driver of the Consolidated truck, testified that when he arrived at the site of the construction, his truck contained 6 yards of cement. At the time of the accident, about 4½ yards of cement were still in the truck. Mr. Loreno also testified that he received no signals or information from the crane operator. He was told by the bucketman employed by the general contractor, Mayfair, when to start to put cement from the truck into the bucket and when to stop.

The plaintiff Crane Service contends that the policy of Travelers provided coverage for the accident "because Consolidated's transit mix was in the process of being unloaded by Bartholomew and the crane when the accident occurred." In *American Auto. Ins. Co.* v. *American Fidelity & Casualty Co.,* 106 Cal.App.2d 630, at pages 634-635 [235 P.2d 645], this court stated: "Generally speaking, in determining whether the accident occurred during the unloading of a motor vehicle within the meaning of a 'loading or unloading' provision in a liability policy, the courts have adopted one of two theories, the 'coming to rest' or the 'complete operation' doctrine.

"Of the two, the 'coming to rest' doctrine gives the more limited construction to the 'loading and unloading' provision. Under this doctrine, 'unloading' includes only the actual removing or lifting of the article from the motor vehicle up to the moment when it has actually come to rest and has started on its course to be delivered by other powers and forces independent of the motor vehicle, and the motor vehicle itself is no longer connected with the process of unloading. The motor vehicle is then said to be no longer in use.

"Under the 'complete operation' doctrine, which is the broader of the two, 'unloading' is regarded as embracing all the operations which are required in any specific situation to effect a completed delivery of the article. For practical pur-

poses, this doctrine makes no distinction between 'unloading' and 'delivery.'[1]

"It has uniformly been held that the 'loading and unloading' provision in insurance contracts, such as involved here, is one of extension. It expands, rather than limits, the term 'the use of' the motor vehicle somewhat beyond its usual connotation so as to bring within the policy some acts in which the motor vehicle itself does not play any part."

In *Colby* v. *Liberty Mutual Ins. Co.*, 220 Cal.App.2d 38 [33 Cal.Rptr. 538], steel girders were transported on a truck to the premises of a school where construction work was in progress. While a mobile crane was being used to unload one of the girders from the truck, the girder struck and injured the truck driver, who thereafter sued the crane operator and the crane owner to recover damages for his injuries. He alleged that his injuries were caused by the negligence of the crane operator. In that case the girders were being moved directly from the truck to their position on the building under construction. This court held that the activity in the course of which the truck driver was injured constituted an unloading of the truck, stating in part (220 Cal.App.2d at p. 43): "It was one continuous operation and the girder had not come to rest. There is no logical basis for distinguishing between the case where the girder is unloaded onto the ground and the case where it is directly placed in position on the building under construction."

---

[1] "In defining the loading and unloading operations, two principal legal doctrines have evolved: the Coming to Rest rule and the Complete Operations rule. Of the two, the Coming to Rest doctrine is the narrower minority view and the one which is becoming more and more outweighed by the trend of modern decisions. Under this theory, . . . [u]nloading is that period of time which begins when the object is first picked up from the vehicle and kept in continuous movement without interruption, until it is set down at its first place of rest outside the vehicle.

"The Complete Operations rule, by far the majority view and certainly the present trend, is much more difficult to define since there is no uniformity in the decisions professing to hold to this doctrine. Generally speaking, under this theory . . . unloading ends when the object has reached its *delivery point or final destination.* The number of temporary or intermediate stops or resting places is immaterial under this doctrine, since the . . . unloading operation is not terminated until the object has finally been placed in the hands of the receiver and at the properly designated reception point. A number of cases have been decided on the basis of the *Complete Operations* theory without a statement of the doctrine itself." (Magarick, *Loading and Unloading under the Standard Automobile Policy,* 67 Dick.L.Rev. 257, 258-259; see also Risjord, *Loading and Unloading,* 13 Vand.L.Rev. 903, 904.)

In the case just discussed, the only way in which removal of the girders from the truck could readily be accomplished was by use of a crane. But in the case presently before this court the truck was equipped with a self-unloading device whereby the concrete was caused to flow from the drum into a chute attached to the truck. Thus, if the form into which the concrete was to be poured had been within reach of the chute, a complete unloading of the truck could have been accomplished without the aid of any other instrumentality.

■ While the fact that a motor vehicle has a self-unloading device of some kind may not, in and of itself, be determinative of the question of coverage under a "loading and unloading" provision of a policy of insurance, it is of particular significance under the circumstances of the present case.

■ It is true that the "loading and unloading" provision in the Travelers policy issued to Consolidated is one of extension. (See *American Auto. Ins. Co.* v. *American Fidelity & Casualty Co., supra,* 106 Cal.App.2d 630, 635.) But it cannot be reasonably said that such expansion of the meaning of the term "the use of" the motor vehicle is without limitation. ■ In determining the scope of the coverage afforded, consideration must be given to the intention of the parties to the contract of insurance. ■ It is not reasonable to conclude that such parties intended an extension of coverage to an accident occurring after concrete has been placed in a receptacle furnished by or on behalf of the purchaser and while it is being mechanically conveyed to a location some distance above the ground. ■ This is so whether the place of ultimate use be many stories above the ground or whether the form in which the concrete is to be poured is at an elevation such as that involved in the present case.

Support for a view contrary to that just expressed can be found in the reasoning of the New York cases of *Lamberti* v. *Anaco Equipment Corp.,* 16 App.Div.2d 121 [226 N.Y. S.2d 70], and *Travelers Ins. Co.* v. *W. F. Saunders & Sons, Inc.,* 18 App.Div.2d 126 [238 N.Y.S.2d 495] (judgment affirmed without opinion by the Court of Appeals of New York, 13 N.Y.2d 1019 [245 N.Y.S.2d 597, 195 N.E.2d 308]). (See also *St. Paul Mercury Ins. Co.* v. *Huitt* (D.C.W.D. Mich. 1963) 215 F.Supp. 709.) ■ But the more cogent reasoning leads to the conclusion that when Consolidated, as it had contracted to do, brought the concrete to the job site and deposited it in the receptacle provided by or on behalf of the

purchaser, the truck was then unloaded insofar as the concrete so deposited was concerned. At that time that concrete had been placed in the hands of the receiver at the designated reception point.

Support for the conclusion just stated is found in *Travelers Ins. Co. v. Employers Casualty Co.* (Tex.Civ.App.) 370 S.W.2d 105. In that case concrete for use in the construction of a school was mixed while being transported in a large revolving drum on a truck. On the site of the work, a chute was lowered at the rear of the truck and the ready-mixed concrete flowed down the chute into a bucket attached to a crane that was owned and operated by the concrete subcontractor, Borders. The bucket was then moved by the crane to a form into which the concrete was emptied. In the course of such a movement, the crane collapsed and three employees of the general contractor were killed. The trial court held that the unloading of the ready-mixed concrete was completed at the instant it was emptied from the ''trans-mix'' truck into the bucket attached to the crane. In affirming the judgment, the Court of Civil Appeals of Texas said in part (370 S.W.2d, at p. 108) : ''The actual unloading of the material from Capitol's truck into Borders' bucket had been completed and Borders' crane collapsed after the concrete had been turned over to Borders.''

There was no error in the determination of the trial court that Travelers was under no duty to defend or indemnify Crane Service or its employee, Bartholomew, with respect to the cause of action of LeRoy Gibson for damages for personal injuries.

The judgment is affirmed.

Shinn, P. J., and Files, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 15, 1964.