FRANKLIN CO-OPERATIVE CREAMERY ASSOCIATION v. EMPLOYERS' LIABILITY ASSURANCE CORPORATION, LTD. OF LONDON AND OTHERS.[1]

June 11, 1937.

No. 31,138.

[1]Reported in 273 N. W. 809.

See 195 Minn. 159, 262 N. W. 149.

*Leonard, Street & Deinard,* for appellant.

*Stinchfield, Mackall, Crounse, McNally & Moore* and *Clyde W. Fiddes,* for respondent.

LORING, JUSTICE.

This was an action under the uniform declaratory judgments act (3 Mason Minn. St. 1936 Supp. §§ 9455-1 to 9455-16( praying for a declaration of the plaintiff's rights under a "teams public and property damage liability policy" issued to it by the Employers' Liability Assurance Corporation, Ltd. of London, the respondent herein.

The principal question presented is whether the coverage of the policy extended to the situation involved in Horgen v. Franklin Co-op. Creamery Assn. 195 Minn. 159, 262 N. W. 149. By the terms of the policy respondent, hereinafter referred to as the insurance company, agreed to investigate, settle, and defend against claims and suits and to pay judgments rendered against the creamery association as a result of liability for—

"bodily injuries, including death at any time resulting therefrom, accidentally sustained by any person or persons other than employees of the assured (1) caused by, and/or owing to the ownership, the maintenance, the use, and/or operation of, all horses, draft animals, and/or vehicles used in connection with the business operations of the assured described in the declarations, and (2) caused by or resulting from the loading and/or *unloading of the said vehicles.*" (Italics supplied.)

The creamery association is engaged in dealing in dairy products and amongst other things distributes milk at retail. For that purpose it uses some horse-drawn vehicles, and the defendant Rundquist was one of its drivers of such a vehicle. His route included the Northwest Terminal Warehouse buildings in Minneapolis, where he sold milk by the bottle to workmen in the various terminal buildings. On the morning of October 6, 1931, he drove his milk wagon to the Northwest Terminal and there distributed milk to various customers in a number of the buildings and finally drove to building No. 1, where he had customers among the workmen of the Hawkinson Tire Company on the third floor. He stopped his wagon in the street in front of the building and put the hitching weight down, filled his containers with milk bottles, and entered the building at a point about 20 feet from his wagon. After entering he walked about 30 feet to a freight elevator, set down his container, and then, for the purpose of using the elevator, pulled on the ropes or cables which controlled its operation. The elevator was operated by an electric motor which he set in motion by pulling the cable, and in so doing he injured Horgen, who was an employe of the Northwest Terminal Company. (Liability established, Horgen v. Franklin Co-op. Creamery Assn. 195 Minn. 159, 262 N. W. 149.) Rundquist was attempting to use the freight elevator for his own convenience instead of walking up two flights of stairs to the third floor. The trial court held that the respondent's policy of insurance did not cover the Horgen accident, and the plaintiff comes here on appeal from an order denying its motion for a new trial.

■ Was the process of unloading complete? We are of the opinion that the trial court rightly held that it was. The process of distributing bottled milk at retail is familiar to us all, and we take judicial notice of it. Rundquist had started on his rounds to peddle milk to his various customers. After he left his wagon carrying his containers the process of retail distribution commenced. If he had served customers on the first floor prior to his attempt to take the elevator it could hardly be contended that he was still engaged in unloading the vehicle. Nor could it be so contended if some accident had happened while he was passing from customer to

customer. We see no difference in principle or in the application of the policy between such situations and the one at bar. Many cases are cited by appellant but are distinguishable on the facts. Necessarily the unloading of a great variety of merchandise involves various situations resulting in various holdings as to when the process of unloading terminates. Within limits, each case must stand on its own facts. This one stands outside the terms of the unloading clause of the policy. And it stands even further without the "operation, maintenance and use" clause. The operation of the freight elevator wholly within the building and remote from the wagon, solely for the driver's convenience in ascending to the third floor, had nothing whatever, in our opinion, to do with "use" of the teams or vehicles.

■ Appellant contends that it was error for the trial court to exclude evidence with regard to the significance of what it claims was, by trade usage and custom, given to the word "unload" in the milk business in the vicinity of Minneapolis. The general rule seems to be that parol testimony will be admitted to explain the meaning of a word other than that meaning generally accepted only when the proof shows a uniform use of the word "in this particular business, in a sense entirely different from its still generally prevailing significance. This peculiar use should appear to have been so general that all persons dealing in respect to the subject must be presumed to have known, and to have contracted with reference to, that customary usage." McManus v. Louden, 53 Minn. 339, 340, 55 N. W. 139. The same rule has been variously stated in numerous cases.

However, an examination of the cases shows how difficult the application of such an apparently simple rule may be. In the McManus case it was sought to show the meaning of the word "cord," established by custom, to be other than that generally prevailing. But in that case there was apparently no objection to the introduction of the evidence tending to show this common usage in the vicinity where the contract was made. The case was decided on the theory that the evidence of a common usage of the word

"cord," other than the generally prevailing one, was so inconclusive that the case had to be affirmed.

In Cogan v. Cook, 22 Minn. 137, 141, however, the question of the admissibility of parol evidence to explain the meaning of the word "half" in a deed to a government lot arose. The court there said:

"As a general rule the terms of a written instrument are to be understood in their plain, ordinary and popular sense. But language may be ambiguous and used in different senses; or general words may, in particular trades and branches of business—as among merchants, for instance—be used in a new, peculiar, or technical sense, for which reason, in a few instances, the testimony of experts is proper to show the peculiar or technical use of the words in the branches of business to which the instrument relates. Courts are not disposed to enlarge the class of cases in which such testimony is admitted, and the danger of admitting it to qualify conveyances of real estate, by which others than the immediate parties may be affected, should impel courts, if not to reject it altogether when offered for such a purpose, at least to apply the most stringent rules to its admission."

While it is true that the court was there commenting upon real estate transfers, yet if there is to be any sanctity at all to a written instrument then parol evidence to alter the very words used in such an instrument should be limited as stated in Holt v. Collyer, 44 L. T. N. S. (Eng.) 214, L. R. 16 Ch. Div. 718, and quoted with approval in 4 Jones, Evidence (2 ed.) § 1538, at p. 2816:

"The principle upon which the words are to be construed in instruments is very plain—when there is a popular and common word used in an instrument, that word must be construed prima facie in its popular and common sense. If it is a word of technical or legal character, it must be construed according to its technical or legal meaning. If it is a word which is of technical and scientific character, then it must be construed according to that which is its primary meaning, namely, its technical and scientific meaning. But before you can give evidence of the secondary meaning of a word, you must satisfy the court, from the instrument itself or from the

circumstances of the case, that the word ought to be construed, not in its popular and primary signification, but according to its secondary intention."

While this rule is not in conflict with that stated in the Cogan case above cited, yet it seems to impose upon the court the exercise of its sound discretion in determining "from the circumstances of the case" whether the evidence is admissible.

A careful examination of many cases seems to bear out the application of this rule. A few cases where parol evidence was excluded from showing a restricted or secondary meaning of a word of general significance are: Kerrick v. G. W. Van Dusen & Co. 32 Minn. 317, 20 N. W. 228 ("corn"); Bader v. New Amsterdam Cas. Co. 102 Minn. 186, 112 N. W. 1065, 120 A. S. R. 613 ("shooting"); Hooker v. Hyde, 61 Wis. 204, 21 N. W. 52 ("help"); Murphey v. Weil, 92 Wis. 467, 66 N. W. 532 ("thermostat"); First Nat. Bank v. Coffin, 162 Mass. 180, 38 N. E. 444 ("deal"); Gray v. Shepard, 147 N. Y. 177, 41 N. E. 500 ("incompatibility").

However, it seems to us that even assuming the word "unloading" had a peculiar significance in the milk trade in Minneapolis, yet by no stretch of imagination could the word have contemplated the running of a freight elevator in no way connected with the milk company's business other than to house some of its customers, or that the policy could have been intended by either party to cover the operation of the freight elevator for the driver's sole convenience, accompanied as it was by a concededly extra hazard.

The other assignments of error have been thoroughly examined and found not to warrant further discussion.

The order denying plaintiff's motion for a new trial is affirmed.