266 Minn. 537 (1963)
124 N.W. (2d) 185
STATE AUTOMOBILE & CASUALTY UNDERWRITERS
v.
CASUALTY UNDERWRITERS, INC.
No. 39,017.
Supreme Court of Minnesota.
October 25, 1963.
Rischmiller, Wasche & Hedelson, for appellant.
Cragg & Barnett, for respondent.
KNUTSON, CHIEF JUSTICE.
This is an appeal from a declaratory judgment in an action commenced *537 to determine liability under an automobile liability insurance policy.
Kenneth S. Ryan was employed by Kasota Cartage Company, Inc., as a truckdriver. On November 6, 1958, he was delivering a load of merchandise to a number of people for Moore Motor Freight Lines. Among other items, he was to deliver about 300 pounds of merchandise to Vescio's Italian Cafe, located at 406 Fourteenth Avenue Southeast, in Minneapolis. The ordinary load carried by Ryan would run from 12,000 to 17,000 pounds, consisting of freight to be delivered to a number of places. The merchandise was loaded in such a fashion that the merchandise to be delivered last would be placed in the truck first in order that it could be conveniently reached when the place of delivery was approached. Vescio's merchandise was about one-third of the way from the rear of the truck.
When Ryan arrived at Vescio's, he stopped his truck along the curb in front of the cafe, about 10 feet from a trapdoor in the sidewalk providing access to the cafe basement. He took the freight bill out of a clip in the cab of the truck to see what merchandise he had for the restaurant and then walked to the kitchen and informed Mr. Vescio that he had a shipment in the truck for him. Vescio then instructed an employee, a boy named Robert L. Gorzycki, to go downstairs and unlock the trapdoor from below so that it could be opened to receive the merchandise. Ryan went back to his truck, opened the accordion-type gate at the rear, and entered the truck. He was in the process of moving Vescio's merchandise to the rear of the truck and checking it with his invoice, when he heard a scream and discovered that a woman, Mrs. Audrey Yardley, had stepped on the trapdoor at the same time as Gorzycki was trying to open it from below, had fallen, and was injured. At the time Mrs. Yardley fell, Ryan was carrying a package to the rear of the truck in order to place it where it could be conveniently reached. He yelled to the boy not to try to open the door from below. Customarily the trapdoor was opened by the truckdriver from above. Ryan's testimony in that respect was:
"A. * * * either I would  would open the chutes, or in the event that the customer that we delivered to, sometimes, occasions they *538 would send out, a man out, to help you, and they would open the chutes, but the chutes are never opened from below. The driver always opened the chute from the top, never from below.
"The Court: You mean the man merely unfastens them?
"The Witness: Yes. They keep them locked all the time and they merely unfasten them to open them from the outside."
After helping the injured woman, Ryan opened the trapdoor and proceeded to deliver Vescio's merchandise by wheeling it from the truck to the trapdoor and handing it to the boy below. He then entered the cafe, had Vescio sign for the goods, and went on his way.
Mrs. Yardley commenced an action to recover for her injuries against Vescio's Italian Cafe, Kenneth S. Ryan, Robert L. Gorzycki, Kasota Cartage Company, Inc., and Moore Motor Freight Lines.
Plaintiff in this action was an insurer on an automobile liability policy issued to Kasota in which it had agreed to pay on behalf of the insured all sums which the insured would become obligated to pay as a result of bodily injuries sustained in an accident arising out of the use of the truck. In a separate provision, "use" was described to include the loading or unloading of the truck.
Defendant in this action was the insurer under a policy covering Vescio for liability arising out of the negligence of his agents and employees. There is some indication in the trial court's memorandum that the policy did not extend coverage to agents and employees but covered only Vescio's negligence. We do not have the policies before us, but that fact is unimportant in any event. This appeal involves only the liability of plaintiff. The question involved is whether the opening of the trapdoor was part of the process of loading or unloading the truck so as to come within the coverage of the policy issued by plaintiff to Kasota.
The trial court found for plaintiff, basing its decision on the fact that, at the time Mrs. Yardley fell, the actual unloading of the merchandise had not yet begun. With that conclusion we cannot agree.
1. In construing an insurance contract, where the language is ambiguous or so uncertain of meaning as to require judicial construction, we seek to ascertain the intention of the parties. The paramount *539 question in construing an insurance contract is: What hazards did the parties intend to cover? It is reasonable to assume here that the parties intended to cover all hazards involved in handling the merchandise from its initial loading until it was unloaded. While the merchandise actually was not being lifted from the truck when the accident occurred, the truckdriver was performing an act incident to and a necessary part of the unloading process. No matter what conclusion we may come to as to the time when unloading ceases, we are convinced that the unloading had commenced when Ryan stopped his truck and began the necessary preparations for physically moving the merchandise.
2. There is another familiar rule that has application here. The language of the contract, having been selected by the insurer, should be construed most strongly against it. In view of the numerous cases to be found concerning the meaning of the language involved in this case, it seems strange that some language could not have been chosen after all these years to clarify what the parties really intended.
Inasmuch as the decision ought to be affirmed if right as a matter of law, even if based on the wrong theory, it is necessary to determine whether opening of the trapdoor to receive the merchandise could have been a part of the unloading process in any event.
3. The term "loading and unloading" of a vehicle, which is an extension of coverage for its use,[1] has been a source of much litigation. The decisions construing this language are anything but harmonious, but they fall mainly into two categories, depending apparently on the viewpoint of the court deciding the case. In one line of authorities it is held that the unloading ceases when the merchandise first is removed from the vehicle and comes to a place of rest. In the other line of cases it is held that the unloading ceases only when delivery of the goods is completed. The two theories are commonly referred to as the "coming to rest" doctrine and the "complete operation" rule, which terms have their origin in Pacific Auto. Ins. Co. v. Commercial Cas. *540 Ins. Co. 108 Utah 500, 161 P. (2d) 423, 160 A.L.R. 1251.[2] While both rules seem simple enough when read literally, the application of either leads to much difficulty when an attempt is made to apply it arbitrarily to facts which differ from those involved in the decision upon which it is based. Apparently the leading case in support of the "coming to rest" theory is Stammer v. Kitzmiller, 226 Wis. 348, 276 N.W. 629.[3] In support of the "complete operation" theory, see State ex rel. Butte Brg. Co. v. District Court, 110 Mont. 250, 100 P. (2d) 932 (cited in Annotation, 160 A.L.R. 1268).
Under the "coming to rest" theory, the unloading ceases when the article is removed from the truck and set down or when the movement which removed it from the truck comes to an end.
In Stammer v. Kitzmiller, supra, an employee of a brewing company was delivering beer to a tavern. He parked the truck alongside the curb, got out, and opened a hatchway in the sidewalk. He then removed a barrel of beer from the truck and placed it either on the sidewalk or on the street pavement. He then lifted the barrel and put it through the hatchway into the basement of the tavern. After completing this operation he entered the tavern to have a sales slip signed, and, while he was engaged in that activity, plaintiff fell into the open hatchway. The policy of insurance was similar to the one involved in the case now before us. In holding that the insurer was not liable, the court said (226 Wis. 352, 276 N.W. 631):
"* * * When the goods have been taken off the automobile and have actually come to rest; when the automobile itself is no longer connected with the process of unloading; and when the material which has been unloaded from the automobile has plainly started on its course to be delivered by other power and forces independent of the automobile and the actual method of unloading, the automobile then may be said to be no longer in use. The precise line at which the unloading of the automobile ends and a further phase of commerce such as the completion of delivery begins after unloading may in some cases be *541 difficult of ascertainment, but where, as here, the merchandise had been removed from the truck and considerable time had elapsed after anything was done which could reasonably be said to be connected with the actual unloading, there is no difficulty in limiting the responsibility of the insurer who covers loading and unloading operations, and fixing the liability of an insurer who protects against loss arising from the acts caused by employees of the assured engaged in the discharge of their duties to carry on its work off the assured's premises. While the open hatchway may have been a convenience in the process of further delivery of the goods, it was not, under the facts with which we are dealing, included in the process of unloading the truck."
In the later case of Hardware Mutual Cas. Co. v. St. Paul Mercury Ind. Co. 264 Wis. 230, 58 N.W. (2d) 646, the opposite result was reached. There, the driver of a brewing company truck stopped in front of a tavern for the purpose of delivering kegs of beer into the basement of the tavern. As in the Stammer case, a trapdoor in the sidewalk was used in moving the kegs from the truck into the basement. The driver walked to the sidewalk and opened the trapdoor preparatory to putting the kegs of beer from the truck through the trapdoor into the basement. The truck was double-parked on the street, and as the driver returned to the truck he was asked to move it so that a car which was parked near the curb could get out. While the truckdriver was moving his truck, a pedestrian fell into the trapdoor which had been left unattended by the driver. In distinguishing the Stammer case and holding that liability existed, the court said (264 Wis. 234, 58 N.W. [2d] 647):
"In the case at bar, the truck and the beer had arrived at the intended destination on the street, and the opening of the trap door by the driver was properly and necessarily the actual commencement of the physical operation of unloading the beer. Apparently no time had needlessly elapsed between the driver's opening of the trap door and the intended continuing movement of the beer into the basement for storage, which was an essential part of the unloading operation."
It is argued that we are committed to the "coming to rest" theory. *542 Our case of Franklin Co-op. Creamery Assn. v. Employers' Lia. Assur. Corp. 200 Minn. 230, 273 N.W. 809, is cited with approval by the Wisconsin court in the Stammer case. In the Franklin Creamery case, a creamery association engaged in dealing in dairy products distributed milk at retail. It used horse-drawn vehicles, and one Rundquist was a driver of such a vehicle. On the morning in question he drove his milk wagon to the Northwest Terminal in Minneapolis, where he intended to deliver milk to various customers in one of the buildings. He stopped his wagon in the street, filled his containers with milk bottles, and entered the building. In attempting to use an elevator, he caused an injury to an employee of the terminal company. We considered whether he was in the process of unloading while using the elevator and held that he was not. That case, however, is based largely on the proposition that in delivering his milk the driver was engaged in two separate operations and that the unloading of his wagon had come to an end when he began delivering the milk. We said (200 Minn. 232, 273 N.W. 810):
"* * * Rundquist had started on his rounds to peddle milk to his various customers. After he left his wagon carrying his containers the process of retail distribution commenced. * * * Necessarily the unloading of a great variety of merchandise involves various situations resulting in various holdings as to when the process of unloading terminates. Within limits, each case must stand on its own facts. This one stands outside the terms of the unloading clause of the policy. * * * The operation of the freight elevator wholly within the building and remote from the wagon, solely for the driver's convenience in ascending to the third floor, had nothing whatever, in our opinion, to do with `use' of the teams or vehicles."
In the later case of St. Paul Mercury Ind. Co. v. Standard Accident Ins. Co. 216 Minn. 103, 106, 11 N.W. (2d) 794, 795, we followed the Franklin Creamery case and said:
"`Unloading' a vehicle means to remove goods therefrom and does not comprehend any further handling or movement thereof."
But here, again, the facts are distinguishable from a case such as we *543 now have before us. There, three separate crews of men were engaged in moving office furniture and equipment from one building to another. One crew moved the furniture and equipment as far as the tailgates of the trucks. The truckdrivers and their helpers transported the goods to the other building, and there another crew moved the furniture from the trucks to its ultimate resting place in the new building. The injury occurred to a member of the third crew who had nothing to do with the operation of the truck.
It is apparent that the facts of a particular case may involve several separate and distinct operations in moving goods from one place to another. Unloading, as it is used in an insurance policy of this kind, may cease when the operator of the truck turns the merchandise over to someone else and has nothing further to do with it, or when  as in the Franklin Creamery case  he commences an operation that is separate and distinct from the unloading process which has been completed. Clearly, the insurance in such a case does not contemplate hazards incident to the operation completely removed from any connection with the use of the truck.
Little can be accomplished by attempting to reconcile the cases on this subject or to discuss the various holdings of the courts throughout the country. The cases are collected in Annotation, 160 A.L.R. 1259, and supplemental decisions, for those who wish to pursue the matter further. There are a few cases that are of interest. In Connecticut Ind. Co. v. Lee (1 Cir.) 168 F. (2d) 420, 425, the court said:
"* * * The driver was about to remove the packages from the truck; certainly they had not come to rest in any way. The acts of the driver in driving up, opening the elevator doors and preparing to remove the packages were closely connected in time and uninterrupted. There was a causal relation between the unloading and the accident. The opening of the elevator doors was necessary in order to carry out the delivery and it was an integral part of the unloading process. We think that this is sufficient to establish the causal relation between unloading and the accident which appears necessary under the Massachusetts decisions. * * * It is sufficient that there is a causal relation between the unloading and the accident."
*544 To hold in every case that unloading ceases the moment an article reaches the ground, even though the truckdriver is to pick it up again and carry it into the place where it is to be delivered to the consignee, but that it continues until actual delivery if the article happens to be of a nature that ordinarily would not be deposited until delivery is actually completed, leads to nothing but absurdity. The rule ought to be that, under language such as we have here, the parties intended to cover all hazards occasioned while the operator of the truck is in control of the parcel, unless his operation contemplates the performance of an act separate and apart from that ordinarily incident to the process of unloading. The weight and nature of the article and the probability that it may momentarily be rested on the ground before final delivery are circumstances which are too tenuous to form the basis of liability. Nor can we say that such was the intention of the parties. On the same trip the truckdriver may deliver a variety of articles ranging from heavy refrigerators to expensive jewelry. To hold that liability ceases if the refrigerator is momentarily rested on the ground but continues until delivery of the parcel of jewelry can hardly be a rational determination of the intention of the parties. If, for instance, the driver had carried a parcel from the truck to the trapdoor; had opened it without setting the parcel down; and had handed it to the boy in the basement, no one would contend, we assume, that all acts were not an integral part of the unloading process. There is no rational basis for drawing a distinction where the same thing is done in a series of movements.
Nor should liability be destroyed because the trapdoor was opened by Robert Gorzycki instead of by Ryan, if opening of the trapdoor was a part of the process of unloading.[4]
All that should be required in a case of this kind is that there be a causal relation between the injury and the hazards covered by the insurance, such as loading or unloading. We think there is such causal relationship here.[5]
Reversed.
NOTES
[1] Pacific Auto. Ins. Co. v. Commercial Cas. Ins. Co. 108 Utah 500, 161 P. (2d) 423, 160 A.L.R. 1251; Ferry v. Protective Ind. Co. 155 Pa. Super. 266, 38 A. (2d) 493.
[2] See, Annotation, 160 A.L.R. 1264, note 8.
[3] See, Annotation, 160 A.L.R. 1264.
[4] See, Bituminous Cas. Corp. v. Travelers Ins. Co. (D. Minn.) 122 F. Supp. 197.
[5] See, Connecticut Ind. Co. v. Lee (1 Cir.) 168 F. (2d) 420.