**LIBERTY MUTUAL INSURANCE COMPANY, Appellant,**

v.

**JOHNSON, DRAKE & PIPER, INC.,** Modern Erecting Co., Harlan Stowe and Wesley P. Janshen, and Continental Casualty Company and Aetna Casualty and Surety Company, Appellees.

**No. 18734.**

United States Court of Appeals
Eighth Circuit.

March 8, 1968.

Francis W. Van Eps, of Robb, Robb, and Van Eps, Minneapolis, Minn., for appellant.

Wright W. Brooks, of Faegre & Benson, Minneapolis, Minn., for appellees Modern Erecting Co. and Aetna Casualty and Surety Co.

Dale I. Larson, of Robins, Davis & Lyons, Minneapolis, Minn., for appellee Wesley P. Janshen.

John G. Kressel, of Ryan, Kain & Kressel, Minneapolis, Minn., for appellees Johnson, Drake & Piper, Inc. and Continental Casualty Co.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

This appeal is from a Minnesota federal district court judgment upon a declaratory judgment action and involves the interpretation of an automobile liability insurance policy covering the use of a ready-mix concrete truck.

In an opinion reported in 258 F.Supp. 603 (D.Minn.1966), the district court held that appellant, Liberty Mutual Insurance Company, was liable under its policy covering a ready-mix concrete truck for injuries sustained by Edward L. Thill, an employee of one of the subcontractors on a construction job, as a result of the falling of a crane which was transporting the concrete to the top of a one-story building for the purpose of pouring a slab roof. The concrete had been unloaded from the ready-mix truck at the job site by the normal process which includes the tilting of the mixer containing the concrete and the positioning of a chute or spout underneath the opening in the mixer from which the concrete pours at the place and/or into the receptacle designated by the purchaser, which in this instance was into a "bucket" attached to a crane. The case was tried to the district court upon a stipulation of facts, and, being a diversity action, the substantive law of Minnesota is controlling. For reasons hereinafter set forth, we reverse the judgment of the district court.

Appellant, Liberty Mutual, provided the insurance for J. L. Shiely Company which delivered the concrete to the construction job site in a ready-mix truck. Appellee Johnson-Drake was the general contractor and in charge of all the construction, which included a one-story building at Wold Chamberlain Airport for the Minneapolis-St. Paul Metropolitan Airport Commission to be used by Western Airlines. The general contractor's insurance carrier, Continental Casualty Company, is likewise an appellee here. Modern Erecting Co., owner of the crane, and Harlan Stowe and Wesley P. Janshen, crane operator and oiler for Modern, are also appellees, as is Aetna Casualty and Surety Company, the insurance carrier for Modern.

Johnson-Drake, the general contractor, had subcontracted the concrete work to Jesco, Inc. and the excavation and other earth moving work to Ashbach Construction Company. Edward L. Thill, the workman who was injured, was an employee of Ashbach, and was engaged in the operation of a backhoe machine with which he was backfilling at the time of the accident.

A day or two before the accident, which occurred on June 23, 1960, the general contractor's superintendent gave instructions to Jesco to be ready to lay the concrete slab for the roof commencing at 8:00 a. m. on the 23rd. The general contractor agreed with Jesco to supply the means for getting the concrete from the ready-mix truck to the roof of the building. The general contractor engaged Modern Erecting Co. to provide a truck crane, a crane operator and a crane oiler, who in this instance were the aforementioned Stowe and Janshen. The general contractor furnished its own bucket to be attached to the crane for conveyance of the concrete to the roof.

Stowe and Janshen brought the truck crane to the job site about 7:45 a. m. on June 23. After a discussion with the general contractor's superintendent, Stowe and Janshen positioned the crane and prepared it for operation. About 9:00 a. m. the hoisting of the concrete began, and the crane had hoisted between fifteen and twenty bucket loads of concrete to the rooftop when the accident occurred at approximately 10:30 a. m. Two of Shiely's ready-mix trucks had been emptied and a third had been partially emptied. This operation was accomplished by the slackening of the cable on the crane and the lowering of the bucket to the ground so that the concrete could be poured from the ready-mix truck into the bucket. Jesco, the concrete subcontractor, had one of its employees stationed by the truck, which

was located about forty feet from the truck crane, in order to spot the bucket. This workman would guide the bucket to the ground before it was filled and would signal the crane operator when to lift it. When the bucket arrived in the vicinity of the roof, the crane operator received signals from Jesco's employees concerning the position of the bucket, and the concrete was placed directly in the forms on the roof.

When the accident occurred, the crane operator had lifted the loaded bucket into the air and swung it about midway to the rooftop when the outriggers began to rise. The crane operator looked for a place to drop the bucket but saw Thill backfilling below, and therefore attempted to raise the boom. It kept tipping, however, and the boom of the crane fell across Thill's tractor, causing severe injuries to Thill and rendering him a paraplegic. Janshen, who was supposed to be on the outside checking the blocking of the crane, was inside the cab of the crane trying to dry out his clothes inasmuch as it was raining. The tractor which the injured workman was operating was located sixty-one feet from the center of the crane in its upright position.

Thill brought an action in the District Court for the County of Hennepin, Minnesota, against Johnson-Drake, Modern, Shiely and Jesco for the recovery of damages for the bodily injuries he sustained in the accident. Harlan Stowe and Wesley P. Janshen were joined as third-party defendants upon the claim of Modern that it was entitled to indemnity against them if Modern should be adjudged liable to Thill. Johnson-Drake, Modern, Stowe and Janshen gave timely notice to Liberty Mutual of their claims to coverage under Shiely's policy with Liberty and tendered to Liberty the defense on their behalf of Thill's state court action, but Liberty declined these tenders. The case went to trial on May 13, 1963, and the jury, by its special verdict, found that Johnson-Drake, Modern and Wesley P. Janshen were negligent and that the negligence of each was a proximate

cause of the accident, and assessed Thill's damages at $642,400.00. On July 10, 1963, the trial court made and filed its Findings of Fact, Conclusions of Law and Order for Judgment, by which it adopted the jury's special verdict and also found that Harlan Stowe was negligent and that his negligence was a proximate cause of the accident, and ordered judgment in Thill's favor against Johnson-Drake and Modern in the sum of $642,400.00. The trial court also ordered that Modern have judgment for indemnity in its favor against Harlan Stowe and Wesley P. Janshen for such sum as Modern was required to pay to Thill. On February 20, 1964, the court amended its order, holding that recovery by Thill of more than $375,000.00 would be excessive and that motions for a new trial would be granted unless Thill consented that the amount of the verdict be reduced to $375,000.00. Thill consented.

An appeal was taken to the Minnesota Supreme Court, which affirmed the trial court's judgment in an opinion reported in Thill v. Modern Erecting Company, 272 Minn. 217, 136 N.W.2d 677 (1965). Upon the filing of the decision on September 3, 1965, Continental paid for Johnson-Drake one-half of the amount of the verdict, interest and costs in the sum of $213,390.44, and Aetna paid the other one-half for Modern, making a total of $426,780.89 paid to Thill.

Appellees brought this action against Liberty Mutual, carrier of Shiely's liability insurance on the concrete ready-mix truck, seeking to recover from Liberty the full amount paid to Thill on the theory that the accident resulted from the unloading of the truck and that under the terms of the policy the employees of the general contractor and/or its subcontractors who were assisting in the unloading were omnibus insureds.

The automobile liability insurance policy issued by Liberty Mutual to J. L. Shiely Co. on the concrete ready-mix truck here involved contains the following provisions:

"DEFINITION OF INSURED. With respect to the insurance for bodily in-

jury liability and for property damage liability the unqualified word 'insured' includes * * * any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. * *

* * * * * *

"Use of the automobile for the purposes stated includes the loading and unloading thereof."

All of the appellees claim coverage, either directly or by way of subrogation, under the omnibus insured clause and the loading-unloading clause of the Liberty policy, and Continental and Aetna claim that their insurance policies provide only excess and secondary coverage. Aetna also asserts that since its policy with Modern does not cover employees such as Stowe and Janshen and since Modern is entitled to indemnity from these employees, Aetna, as subrogee of Modern, is entitled to recover from Liberty because Stowe and Janshen are covered by Shiely's policy with Liberty.

Liberty contends in defense of these claims that the tipping of the crane and the resultant injuries to Thill did not arise out of the use of the Shiely truck, or out of the unloading of the truck within the meaning of the Liberty policy; that no causal relation existed between any use of the truck and an accident caused by an instrumentality under the operation and control of separate and independent parties; that the loading and unloading clause is inapplicable to an organization which is guilty of a breach of statutory duty with regard to the erection, inspection and operation of the crane; and that the remoteness from the Shiely truck of the negligence causing the accident precludes recovery under the Liberty policy.

In deciding the case, the trial court took note of the following: That a multitude of judicial decisions present little in the way of consistency in determining the scope of "loading and unloading" as those terms are used in automobile liability insurance policies; that Minnesota is not as clearly or firmly committed to any definite viewpoint in this area as some jurisdictions; that it remains somewhat unclear what scope Minnesota intends to give to coverage under "loading-unloading" clauses; that, based on some of the earlier cases, certain authorities previously placed Minnesota among the jurisdictions adhering to the "coming to rest" rule; and that none of the Minnesota decisions expressly commit the jurisdiction to the "complete operation" theory.

The district court was of the view, however, that under Minnesota law the accident was within the scope of coverage of the Liberty policy by reason of the policy's "loading-unloading" provision, and that under Minnesota law appellees were "using" the Shiely truck by participation in the unloading process at the time of the accident. The recent case of Fidelity & Cas. Co. of N. Y. v. Allstate Ins. Co., 146 N.W.2d 869 (Minn. 1966), handed down by the Minnesota Supreme Court subsequent to the district court's opinion, compels our holding that the unloading process had been completed before the accident occurred and that, therefore, Liberty is not liable under the policy for damages awarded Thill for his injuries. Furthermore, we find no evidence in the record to support the court's holding that it was the intent of the parties to the insurance contract— Liberty Mutual and Shiely—that the policy would cover such an accident.

The extent of the litigation and the contrariety of views construing insurance policies with provisions similar to the ones with which we are concerned here are evidenced by the annotations on the subject in 160 A.L.R. 1259 as supplemented in 95 A.L.R.2d 1122. From this type of litigation there evolved what is known as the "coming to rest" doctrine and the "complete operation" doctrine. As the names imply, the "coming to rest" doctrine limits liability to a period during the actual removal of the article from the vehicle until it comes to rest, whereas the "complete operation" doctrine affords coverage under such provisions of a policy to extend to all

operations involving the handling of the article from the vehicle to its final destination. Some courts, however, have preferred to consider such cases on the particular facts existing therein without resort to application of either doctrine.

Illustrative of one view are the following cases cited by appellees: St. Paul Mercury Ins. Co. v. Huitt, 336 F.2d 37 (6th Cir. 1964), affirming 215 F. Supp. 709 (W.D.Mich.1963); Travelers Ins. Co. v. Employers Cas. Co., 380 S.W. 2d 610 (Tex.1964), reversing 370 S.W.2d 105 (Tex.Civ.App.1963); Lamberti v. Anaco Equipment Corp., 16 A.D.2d 121, 226 N.Y.S.2d 70 (1962); Travelers Ins. Co. v. W. F. Saunders & Sons, Inc., 18 A.D.2d 126, 238 N.Y.S.2d 495 (1963), affirmed 13 N.Y.2d 1019, 245 N.Y.S.2d 597, 195 N.E.2d 308 (1963). Generally, these cases hold that coverage exists under the "loading and unloading" clause of a motor vehicle liability policy issued to the owner of a ready-mix truck where accidents occur during the process of delivery of the concrete, by use of a ready-mix truck, a crane and a bucket, to the place where the purchaser is to pour it into prepared forms.

Contrarily, and more recently, there is equally respectable authority holding that in such situations there is a lack of coverage under similar policy provisions. As an example, the Court of Appeals of Maryland in United States Fid. & Guar. Co. v. Backus, 243 Md. 121, 220 A.2d 139, 140, 141 (1966), said:

"Maloney Concrete had contracted to sell mixed concrete and deliver it to the job site. In the course of that contract, mixed concrete was poured by the truck driver into the crane bucket and the bucket was filled. This bucket was attached to the crane, operated by Rockville Crane, by a cable which had a hook at its end without any safety catch and was then lifted up to the building under construction. The crane operator 'jiggled' the bucket off the hook to which it was attached, the bucket filled with concrete fell, struck a steel beam on the ground, which in turn injured Mr. Backus.

\*   \*   \*   \*   \*   \*

"Assuming, without deciding, that the 'complete operation' doctrine applies, we are of the opinion that under the facts of this case, the delivery of the particular concrete was completed when it was delivered 'at the site' by being placed in the bucket and there was no causal connection between the unloading by the truck operator and the accident which allegedly resulted in injuries to Mr. Backus.

"In the case at bar, the contract between the purchaser of the mixed concrete and Maloney Concrete in regard to delivery was clear and unambiguous. It was to be delivered 'at the job site,' and was not to be delivered 'in place.' The contract in regard to delivery was fully performed when the truck operator placed the concrete in the bucket provided by the purchaser 'at the site' to receive it. After the bucket was filled, possession passed to the crane operator who then had full and complete control over it. The crane operator was acting under instructions of the general contractor, as purchaser, in regard to when and how to place the concrete at various places on the construction. This was entirely unconnected with the Maloney Concrete truck and its operator. There is no suggestion that the truck operator negligently or improperly placed the concrete in the bucket or that the method of pouring the concrete into the bucket had anything to do with the subsequent fall of the bucket. On the contrary, the stipulated facts establish that the bucket fell because there was no safety catch on the cable to hold the bucket and that the bucket fell when the cable was 'jiggled' by the crane operator. The truck operator had nothing whatever to do with the fall of the bucket and there is no causal relation established between the actions necessary to unload the truck and the accident for which recovery is sought. Under these circumstances, the 'complete operation' doctrine, if applicable, would not impose liability under the 'loading and

unloading' clause in the insurance policy. See Maryland Casualty Co. v. United Corp. of Mass., 35 F.Supp. 570 (D.Mass.1940); Zurich General Accident & Liability Ins. Co. v. American Mutual Liability Ins. Co., of Boston, 118 N.J.L. 317, 192 A. 387 (1937); Handley v. Oakley, 10 Wash.2d 396, 116 P.2d 833 (1941); Rogers v. Continental Casualty Co., 155 So.2d 641 (Fla. App.1963); General Accident Fire & Life Assur. Corp. v. Brown, 35 Ill.App. 2d 43, 181 N.E.2d 191 (1962); and Ferry v. Protective Indemnity Co. of New York, 155 Pa.Super. 266, 38 A.2d 493 (1944)."

To the same effect, see San Fernando Valley Crane Service Inc. v. Travelers Ins. Co., 229 Cal.App.2d 229, 40 Cal. Rptr. 165, 170 (1964).

We now consider the Minnestota cases involving the construction of the "use" and "loading and unloading" provisions of automobile liability insurance policies.

One of the earliest Minnesota cases, Franklin Co-op. Creamery Ass'n v. Employers' Liability Assur. Corp., 200 Minn. 230, 273 N.W. 809 (1937), concerned an insurance policy covering the Creamery's liability for injuries caused by the operation, maintenance and use of all horses and vehicles used in connection with the Creamery's business operations, including the unloading of said vehicles. The facts showed that the driver of one of the Creamery's milk wagons had parked the wagon outside a building, filled his containers with milk bottles, and carried them inside for the purpose of distributing milk to third-floor customers. He set the containers down at an elevator and pulled the elevator cable, which controlled its operation, causing injury to a third party who was removing a heavily laden hand truck from the elevator. The Court held that the Creamery's insurance carrier was not liable since the process of unloading had been completed and the process of retail distribution had begun before the accident occurred, noting, however, that, within limits, each case must stand on its own facts.

The next case in which the Minnesota Supreme Court had occasion to consider this question was St. Paul Mercury Indemnity Co. v. Standard Accident Ins. Co., 216 Minn. 103, 11 N.W.2d 794 (1943), wherein the court held that where furniture had been delivered to a building in a truck by one crew of workmen and placed on the sidewalk and the truck was driving away, the insurer of the truck was not liable under the unloading clause for an injury sustained by a workman on another crew who fell on a ramp as he came out of the building to deliver the furniture to the proper office, even though both crews worked for the same company.

These earlier cases caused Minnesota to be characterized as a "coming to rest" state. See annotation entitled "Risks within 'loading and unloading' clause of automobile liability insurance policy," 160 A.L.R. 1259, 1265–1266. In a supplemental annotation in 95 A.L.R.2d 1122, 1132, Minnesota is listed among those states whose legal theory is not clearly designated.

In Gamble-Skogmo, Inc. v. Saint Paul Mercury Indemnity Co., 242 Minn. 91, 64 N.W.2d 380 (1954), the court held in a situation where an accident occurred while a piece of farm machinery was being reassembled preparatory to unloading it from the delivery truck that the insurer of the truck was not liable under the "use" or "loading and unloading" clauses of its liability policy for injuries sustained by a third party. The court found that the cause of the accident was the failure of Gamble-Skogmo, Inc., which sold the machinery, to properly instruct its employee who delivered it in the method of assembly thereof and that, this being the cause of the accident, the carrier of Gamble-Skogmo's public liability policy was liable and not the insurer of the truck. In reaching its conclusion, the court assumed, without deciding, that the unloading operations defined in the automobile policy there involved *were* in progress at the time of the accident, but held, nevertheless, that

the accident did not result from the use or unloading of the truck.

In State Automobile & Cas. Underwriters v. Casualty Underwriters, Inc., 266 Minn. 536, 124 N.W.2d 185 (1963), where a pedestrian was injured by falling into an opening on the sidewalk after the trapdoor covering it had been opened preparatory to unloading the truck, the court held that opening the trapdoor was a part of the process of unloading the merchandise into the basement of the consignee by the truck driver since the merchandise could not otherwise be placed where the *driver* intended it to be, and that the accident was covered by the loading and unloading clause of the truck owner's automobile liability policy. Distinguishing the facts in the *State Automobile* case from the facts in the earlier case of St. Paul Mercury Indemnity Co. v. Standard Accident Ins. Co., supra, which, as hereinbefore stated, held that unloading a vehicle means to remove goods therefrom and does not comprehend any further handling or movement thereof, the court said (124 N.W.2d at 189):

"But here, again, the facts are distinguishable from a case such as we now have before us. There, three separate crews of men were engaged in moving office furniture and equipment from one building to another. One crew moved the furniture and equipment as far as the tailgates of the trucks. The truckdrivers and their helpers transported the goods to the other building, and there another crew moved the furniture from the trucks to its ultimate resting place in the new building. The injury occurred to a member of the third crew who had nothing to do with the operation of the truck.

"It is apparent that the facts of a particular case may involve several separate and distinct operations in moving goods from one place to another. *Unloading, as it is used in an insurance policy of this kind, may cease when the operator of the truck turns the merchandise over to someone else and has nothing further to do with it,*

*or when*—as in the *Franklin Creamery* case—*he commences an operation that is separate and distinct from the unloading process which has been completed.* Clearly, the insurance in such a case does not contemplate hazards incident to the operation completely removed from any connection with the use of the truck."

Thus, the court enumerated two conditions, under either of which the unloading process may cease, and we think both are present here. It is clear that Shiely was obligated merely to take the concrete to the job site and turn it over to the subcontractor who had been employed by the general contractor to lift it to the place where it was to be poured into a slab roof and that Shiely's driver did just this. It is also clear that when the truck driver unloaded it from the truck into the receptacle provided, he had nothing further to do with it and no control over it. Thus, as far as the Shiely company, its driver, and its insurer were concerned, the unloading process was complete. It is equally clear that the primary purpose of the crane was to lift the concrete to the rooftop in order to pour the roof and not to unload it from the truck, since the concrete poured from the truck by force of gravity, and that this hoisting process was a separate operation for which Shiely was in no way responsible.

The district court pointed out that in the *State Automobile* case, supra, the Minnesota Supreme Court declined to use either the "coming to rest" or "complete operation" theory, reasoning that the facts of each case make the issue largely an individual case by case determination. The district court, however, interpreted the court's opinion as holding that the "coming to rest" rule is unusable since it is based on the absurdity of whether or not the article is of the type, mostly dependent on size, which is usually put to rest, at least momentarily, during the process of delivery. In this regard, the court said in the *State Automobile* case (124 N.W.2d at page 190):

"*The rule ought* to be that, under language such as we have here, the

parties intended *to cover all hazards occasioned while the operator of the truck is in control of the parcel,* unless his operation contemplates the performance of an act separate and apart from that ordinarily incident to the process of unloading." (Emphasis added.)

Thus, the court is saying that if the truck driver has a duty to deliver the goods to a certain place (which was the basement of the consignee in the *State Automobile* case) and this has not been accomplished but the parcel is still within the control of the truck driver, then it makes no difference if he puts it down momentarily on the way to the basement. Here we have the absence of any agreement or duty on Shiely's part to transport the concrete to the rooftop, as well as the absence of any control by Shiely's driver over the concrete which had been unloaded into the bucket, or any control over the crane, when the accident occurred, and, therefore, the unloading of the concrete here involved had been completed by Shiely at the time of the accident.

The district court's memorandum opinion in the case before us was issued on September 23, 1966, and on December 2, 1966 the Minnesota Supreme Court rendered its opinion in Fidelity & Cas. Co. of New York v. Allstate Ins. Co., supra, involving a similar factual situation which further clarifies the court's position in the area of the law here involved.[1] The *Allstate* case concerned an accident to the driver of a truck delivering soybeans which occurred as the beans were being dumped into a hopper. The driver of the truck had stepped into the hopper to unfasten the tailgate of the truck when a third person, upon seeing the beans begin to pour into the hopper, turned on a rotating auger inside the hopper in order to carry the beans from ground level to the top of a nearby storage facility where they were to be stored. The auger caught the driver's foot, injuring it. The Minnesota court held that the removal of the beans from the place where Christensen, the driver, intended to deposit them was not an integral part of the unloading process and, therefore, the accident did not result from the unloading of the truck and was not covered by the truck owner's liability policy. Appellees contend that the *Allstate* case is not in point since the policy there involved did not have a loading and unloading clause; however, in determining whether the accident was covered under the use clause of the policy, the court specifically found that under the factual situation involved the accident did not result from the loading or unloading of the vehicle. In this regard, the court said (146 N.W.2d 871–872):

"The critical finding of the trial court reads as follows:

" ' * * * [T]he injuries sustained by * * * Christensen were not in fact caused by or owing to the ownership, maintenance, use or operation of the Christensen vehicle, or caused by or resulting from the loading or unloading of said Christensen vehicle, but on the contrary, were solely caused by and resulted from the negligent operation of Archer-Daniels-Midland premises by Archer-Daniels-Midland employees.'

* * * * * *

" * * * The record supports a finding that the unloading operation was completed so far as Christensen was concerned when the soybeans were permitted to drop by force of gravity at the place designated by the operator of the elevator. The purpose of the rotating auger as placed by A.D.M. on its premises was primarily to expedite the storage of the delivered beans. This function, we believe, was more directly related to the storage function

1. Even though the *Allstate* case was not decided by the Minnesota Supreme Court until December 2, 1966, and the opinion in the present case was handed down prior thereto (on October 13, 1966), the district court nevertheless considered the *Allstate* opinion in ruling on appellant's motion for amended findings, as reflected by its order entered December 19, 1966, wherein said motion was denied.

of the elevator company than to the unloading of the truck. Christensen's contemplated delivery was completed by unloading the beans on the ground at the receptacle. The removal of the beans from that point to the storage facility was A.D.M.'s responsibility and part of its business operations.

"In concluding that the determination of the trial court should be affirmed, we recognize that the case in some respects presents a borderline problem. This is so because the hopper into which the beans were to have been put was not sufficiently large to contain the 80 bushels of beans being unloaded without transfer of some of the beans from the hopper to the storage bins through the medium of the auger. Nevertheless, in our judgment the trial court was justified in concluding that the process by which the beans were lifted from the place of unloading to a place of relatively permanent storage was not an integral part of the unloading process and that the lifting operation for which the auger was used constituted an act 'separate and apart from that ordinarily incident to the process of unloading' within the meaning of our decision in State Automobile & Casualty Underwriters v. Casualty Underwriters, Inc., 266 Minn. 536, 544, 124 N.W.2d 185, 190."

Thus, it is not a decisive factor and makes no material difference in the present case that the "bucket" into which the concrete was poured would hold only 33 cubic feet of concrete, or approximately one-fifth of what the ready-mix truck delivered. It still follows that Shiely's function was merely to deliver the concrete to the job site and pour it from the ready-mix truck into the bucket provided, and that Shiely had no further responsibility or liability in connection therewith. The lifting of the concrete to the rooftop was for the purpose of pouring the roof and was a separate operation, for which the general contractor assumed the full responsibility of securing a subcontractor to do the work. The primary purpose of

Modern's crane, which caused the accident, was to lift the concrete in the bucket to the rooftop where the Jesco employees were pouring the roof, and the truck owner or driver had no responsibility for this operation and no control over it.

In discussing the *State Automobile* case, supra, in the *Allstate* opinion, the court noted that the sum in controversy was paid in settlement of a personal injury which occurred when a pedestrian was injured by a sidewalk trapdoor being opened from below to permit a truck operator to deposit freight in the basement of the consignee's premises adjoining the sidewalk, and then said (146 N.W.2d at 871):

"We held there that the accident arose out of the ownership, maintenance, and use of the delivery truck including the unloading thereof *because the truckdriver had the responsibility for placing the freight in the basement of the building* adjoining the sidewalk and the raising of the trapdoor was an integral part of this process. * * *" (Emphasis added.)

Again, the court is emphasizing that the unloading process was not complete in the *State Automobile* case because the truck driver had the responsibility of placing the freight in the basement, which he had not yet accomplished, and, further, that he still had the freight under his control. Neither situation is present here.

Further commenting in the *Allstate* opinion concerning its earlier decisions, the Minnesota Supreme Court said (146 N.W.2d 871–872):

"Judgment having been entered in favor of Allstate, the problem on appeal becomes one of deciding whether the determination of the trial court was erroneous in light of such recent cases as State Automobile & Casualty Underwriters v. Casualty Underwriters, Inc., 266 Minn. 536, 124 N.W.2d 185, and Minneapolis, St. P. & S. S. M. R. Co.

v. St. Paul Mercury-Ind. Co., 268 Minn. 390, 129 N.W.2d 777.[2]

\* \* \* \* \* \*

"The distinguishing feature of State Automobile & Casualty Underwriters v. Casualty Underwriters, Inc., supra, as applied to the current problem comes from the fact that there we considered the transfer of the freight from the truck to the basement of the consignee's place of business to be an essential part of the process of unloading. We said in effect that the freight was not 'unloaded' until put in the place *where the hauler intended it to be.* Dealing with the reverse situation in Minneapolis, St. P. & S. S. M. R. Co. v. St. Paul Mercury-Ind. Co., supra, we said in effect that the loading operation *commenced when the employee took possession of the freight for the purpose and with the intent of loading it.* "So considered, these cases serve to highlight the distinguishing characteristic of the problem before us because here *the removal of the soybeans from the place where Christensen [the truck owner and driver] intended to deposit this grain was not an integral part of the unloading process."* (Emphasis added.)

To paraphrase the Minnesota court's opinion in the *Allstate* case, the record supports a finding that the unloading operation was completed so far as Shiely and its driver were concerned when the concrete was permited to pour by force of gravity at the place designated by the operator of the crane. The purpose of the crane, as placed on the premises by Modern Erecting Co., the subcontractor, at the direction of Johnson-Drake, the general contractor, was primarily to expedite the lifting of the delivered concrete. This function, we believe, was more directly related to the lifting function of the erecting company than to the unloading of the truck. Shiely's contemplated delivery was completed by unloading the concrete into the receptacle (the bucket attached to the crane) which was provided.

It is contended that the "loading-unloading" provision is an extension of the policy coverage. Most certainly it is, but there must be a limit to its extension. Obviously, it extends coverage for the use of the vehicle only to encompass its loading and unloading operations and no further. The language is simple and understandable and should not be stretched by the court to cover other functions with which the vehicle and its operator were not involved and which the owner or driver of the truck had no obligation to perform nor any control over. Aside from the general contractor's obligation, two separate parties were involved in the completely separate operation after the concrete was delivered to the job site by the truck. Jesco, the concrete subcontractor, directed the placement of the bucket to receive the concrete, gave the signal to commence the hoisting operation and the signal as to location on the roof for the concrete to be deposited. The other intervening party was the crane company and its employees who performed the lifting operation. The state court jury absolved Jesco from liability as it did Shiely, Liberty's assured, and placed the responsibility where it rightfully belonged—on the general contractor and the crane company and its employees for their negligence in the erection, inspection and operation of the crane.

We find no merit in appellees' attempt to distinguish the *Allstate* case because the policy there did not contain the

---

2. It will be noted that the Minnesota Supreme Court did not cite in *Allstate* the Minnesota federal district court case of Bituminous Cas. Corp. v. Travelers Ins. Co., 122 F.Supp. 197 (D.Minn.1954), which the district court in the case before us considered supported its view. We think that the *Bituminous* case is readily distinguishable from the present case on its facts. There, the truck had no self-loading device and the crane was being used to load lime *into* the truck from a quarry; whereas in the present case the truck had a self-unloading device whereby the concrete could pour down a chute from the truck into the receptacle provided by the purchaser.

"loading-unloading" provision. As a matter of fact, Mr. Justice Sheran, speaking for a unanimous court, defined the problem as one of deciding whether the trial court was erroneous in finding that the injuries sustained were in fact caused by or owing to the ownership, maintenance, use or operation of the vehicle or caused by or resulting from the loading or unloading of said vehicle, in light of such recent cases as *State Automobile Casualty Underwriters,* supra, and *St. P. & S. S. M. R. Co.,* supra, both involving policies having the "loading-unloading" clause. The important thing in *Allstate* is the court's conclusion in a strikingly similar factual situation that the "unloading operation" was completed insofar as the truck driver was concerned when the soybeans were permitted to drop by force of gravity at the place designated by the purchaser. Here, also, the unloading was completed under Minnesota law when Shiely permitted the concrete to pour by force of gravity at the place designated by the consignee.

Additionally, Justice Sheran quoted in *Allstate,* supra, "the rule ought to be" as first articulated by the Minnesota Supreme Court in *State Automobile and Casualty Underwriters,* supra, and followed in *St. P. & S. S. M. R. Co.,* supra. This rule is that the parties intended to cover all hazards occasioned while the operator of the truck is in control of the parcel, unless his operation contemplates the performance of an act separate and apart from that ordinarily incident to the process of loading. The Minnesota court has never adopted the "complete operation" doctrine despite many opportunities subsequent to decisions of other courts that have, and we do not think we are authorized to do it for that court. Close reading of the later Minnesota cases reflects a practical case by case approach. To affirm here would be, in effect, to apply in an expanded form the "complete operation" doctrine and to close our eyes to the recent Minnesota decision in *Allstate,* supra, finding that unloading terminates when the article is deposited at the place designated by the consignee and when the truck operator had lost control of same.

For the reasons stated, the judgment is reversed, and accordingly it is directed that the district court dismiss the complaint.